## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| **ARTHUR PODROYKIN,** on behalf of himself and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**MYHERITAGE (USA), INC.,**<br><br>Defendant. | Case No. 1:25-cv-402<br><br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Arthur Podroykin ("Plaintiff"), individually and on behalf of all similarly situated persons, alleges the following against MyHeritage (USA), Inc. ("MyHeritage" or "Defendant") based upon personal knowledge with respect to himself and on information and belief derived from, among other things, investigation by Plaintiff's counsel and review of public documents as to all other matters:

## INTRODUCTION

1. A person's genetic code is the single most sensitive piece of information pertaining to them. It can reveal facets of their life, including their health conditions, ethnic background, predisposition to cognitive and physical disorders, their parentage, and the parentage of their children.

2. Consequently, when individuals undergo genetic testing, they are subject to an inherent risk: if their genetic information is misused or improperly disclosed by a testing company, it can never be fully remedied. Unlike a credit card number, telephone number, or even a social

1

security number, genetic information is immutable. It cannot be altered to preclude an individual with access from using it or sharing it with an unauthorized third party in the future.

3.       Unfortunately, unbeknownst to Plaintiff and other visitors to Defendant's website, Defendant does not keep private sensitive information about its visitors' genetic testing. Instead, Defendant collects and transmits personally identifiable information regarding both the fact that its customers have been subject to genetic testing and the results of that genetic testing (collectively, "Genetic Testing Information") to third parties, including Alphabet, Inc. ("Google"), through its use of surreptitious online tracking tools.

4.       Online advertising giants, like Google, compile as much information as possible about American consumers, including information relating to the most private aspects of their lives, as fuel for their massive, targeted advertising enterprise. Thus, any information about a person captured can be used to stream ads to that person. If Google receives information that a person is using genetic testing to research their ancestry or health conditions, they will use that information, and allow their clients to use that information, to stream ads related to genetic testing products, as well as products and services related to the person's genetic results or health conditions.

5.       Google offers website operators access to its proprietary suites of marketing, advertising, and customer analytics software, including Google Analytics, Google AdSense, and Google Tag Manager (collectively, the "Business Tools"). Armed with these Business Tools, website operators can leverage Google's enormous database of consumer information for the purposes of deploying targeted advertisements, performing minute analyses of their customer bases, and identifying new market segments that may be exploited.

6.       But, in exchange for access to these Business Tools, website operators install

2

Google's surveillance software on their website (the "Tracking Tools"), including 'tracking pixels' ("Pixels") and third-party 'cookies' that capture sensitive, personally identifiable information provided to the website operator by its website users. This sensitive information can include a unique identifier that Google uses to identify that user, regardless of what computer or phone is used to access the website. The Tracking Tools can also capture and share other information like the specific webpages visited by a website user, items added to an online shopping cart by a website user, information entered into an online form by a website user, and the device characteristics of a website user's phone or computer.

7.     In essence, when website operators use Google's Business Tools, they choose to participate in Google's mass surveillance network and, in turn, benefit from Google's collection of user data at the expense of their customers' privacy.

8.     MyHeritage is one of the many companies that has chosen to prioritize its marketing efforts over its customers' privacy, by installing Google's Tracking Tools on its website.

9.     MyHeritage is a direct-to-consumer ("DTC") genetic testing kit provider that uses DNA testing to identify its customers' "unique ethnic background."[1] According to its website, "[m]illions of families around the world use MyHeritage to explore their history."[2]

10.     To use Defendant's genetic testing service, consumers purchase one of Defendant's test kits through its website, www.myheritage.com (the "Website"), or from a third-party retailer, and provide a saliva sample to the Defendant for genetic analysis.

11.     To receive their genetic testing results, Defendant's customers, like Plaintiff and Class Members, are required to register on Defendant's Website. When Defendant completes its

---

[1] *Home Page*, MYHERITAGE, https://www.myheritage.com/ (last visited Jan. 8, 2025).

[2] *Id.*

genetic analysis, Defendant's customers must log into its Website portal to view their genetic testing results.

12.     In its Privacy Policy, Defendant explicitly promises its customers, like Plaintiff and Class Members, that "MYHERITAGE HAS NEVER SOLD OR LICENSED GENETIC DATA OR HEALTH DATA, AND WILL NEVER DO SO IN THE FUTURE"[3]

13.     Each of the Plaintiff and Class Members visited the Website and had their personal Genetic Testing Information disclosed by Defendant using the Tracking Tools.  However, Defendant **never** obtained authorization from Plaintiff or Class Members to share their Genetic Testing Information with third parties. At all times relevant to this action, Plaintiff and Class Members gave no informed consent for information about their Genetic Testing Information to be transmitted to the third parties, including the largest advertiser and compiler of consumer data in the world.

14.     Defendant's transmission of Plaintiff's and Class Members' genetic testing information was not just contrary to its customers' reasonable expectation of privacy and its own Privacy Statement – it was also a violation of Illinois law.

15.     In recognition of the highly sensitive nature of genetic testing information, Illinois has enacted legislation decreeing that genetic testing and information derived therefrom is confidential. This statute, the Illinois Genetic Information Privacy Act, 410 ILCS 513/1, *et. seq* ("GIPA"), acknowledge that maintaining the confidentiality of genetic information is in the public interest.[4]

---

[3] *Privacy Policy*, MYHERITAGE, https://www.myheritage.com/privacy-policy (last visited Jan. 8, 2025).

[4] *See* 410 ILCS 513/5(2)-(3): "[M]any members of the public are deterred from seeking genetic testing because of fear that test results will be disclosed without consent in a manner not permitted by law[.]"; "The public health will be served by facilitating voluntary and confidential nondiscriminatory use of genetic testing information."

16.     Consistent with this goal, GIPA provides strong legal protections to ensure that Illinois residents can take advantage of the knowledge that can be gained from obtaining personal genetic information, without fear that this same information could be disclosed to third parties without their consent.

17.     GIPA prohibits DTC test kit companies like Defendant from sharing information derived from genetic tests, including the fact that an individual was the subject of a genetic test. Such information may be released only to the individual tested and to persons specifically authorized by the test subject.

18.     Defendant chose to repeatedly disregard Illinois' genetic privacy laws by sharing consumers' confidential genetic information.

19.     Accordingly, Plaintiff seeks on behalf of himself, and all others similarly situated in the state, an order: (i) requiring Defendant to cease the unlawful activities discussed herein; and (ii) awarding actual and/or statutory damages to Plaintiff and the members of the proposed Class.

## PARTIES

### *Plaintiff Arthur Podroykin*

20.     Plaintiff Podroykin is a citizen of the state of Illinois, residing in Champaign County and brings this action in an individual capacity, and on behalf of all others similarly situated.

21.     In or around May 2021, Plaintiff Podroykin purchased a genetic test kit from Defendant's website. Defendant required Plaintiff to make an account on its website in order to access the test results. When the results of his genetic testing were made available by Defendant, Plaintiff was required to use Defendant's Website on his personal electronic devices to review the findings of Defendant's genetic analysis.

22.     Plaintiff Podroykin reviewed the results of his genetic testing in the same manner

as depicted in Section V(A)(d), *infra*.

23.     Unbeknownst to Plaintiff Podroykin, when he reviewed the results of his genetic test Defendant transmitted his Genetic Testing Information to unauthorized third parties, including Google.

24.     The information transmitted to Google and other third parties by the Pixels installed on Defendant's website including the fact that he was the subject of genetic testing, the results of that genetic testing, and that he was viewing his "DNA Results," as well as his last name.

25.     Further, the information transmitted to Google was accompanied by specific lines of code linking the information transmitted to Google to Plaintiff's identity. Defendant's website transmitted the identifier number attached to Google's '_cid' and '_gid' cookies, which identify the Plaintiff's Google account. Defendant's website also transmitted information that is commonly used to create a browser fingerprint, such as Plaintiff's language selection, screen resolution, location, and IP address information.

26.     Plaintiff Podroykin never authorized Defendant to disclose any aspect of his communications with Defendant through its Website to third parties, including the Genetic Testing Information that he provided to Defendant.

27.     On every occasion that he visited Defendant's Website, Plaintiff Podroykin possessed accounts with Google, and he accessed Defendant's Website while logged into his Google account on the same device.

28.     After providing his Genetic Testing Information to Defendant through the Website, Plaintiff Podroykin began seeing targeted online advertisements for genetic testing products.

***Defendant MyHeritage (USA), Inc.***

29.     MyHeritage (USA), Inc. is a limited company incorporated in the State of

6

Delaware, with its principal place of business at 3098 Executive Parkway, Suite 275, Lehi, UT 84043, in Utah County.

**JURISDICTION AND VENUE**

30. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative class members and minimal diversity exists because Plaintiff and many putative class members are citizens of a different state than Defendant. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

31. This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this Complaint alleges question of federal laws under the ECPA (18 U.S.C. § 2511, et seq.).

32. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein are part of the same case or controversy.

33. This Court has personal jurisdiction over Defendant because Defendant regularly conducts business in the State of Illinois, and because Defendant has targeted advertising and sold its DTC genetic testing products to consumers in the State of Illinois and in this judicial district.

34. Personal jurisdiction is also proper because Defendant committed tortious acts in the State of Illinois and this judicial district and Plaintiff's claims arise out of such acts, and/or because Defendant has otherwise made or established contacts in the State of Illinois and in this judicial district sufficient to permit the exercise of personal jurisdiction.

35. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims in this action occurred in this judicial district, including the disclosure of Plaintiff's information.

**THE ILLINOIS GENETIC INFORMATION PRIVACY ACT ("GIPA")**

36.     During the 1990s, the U.S. government poured billions of dollars into the Human Genome Project in an attempt to map the entire human genetic code. When President Clinton announced the first successful "rough draft" of the Project in 2000, he hailed it as one of the great achievements of human history, and said: "Today we are learning the language with which God created life[.]"[5]

37.     However, like any great leap in human understanding, learning the meaning of people's genetics came with many concerns. Illinois stood at the forefront of protecting its citizens from the abuse of this technology when it first passed GIPA in 1998. According to the Illinois Legislature, the intent of GIPA is to encourage the public to embrace genetic testing by eliminating any perception that genetic information gleaned from those tests (such as family medical history) could later be demanded from and/or used against them. Limiting "requests for [] protected health information to the minimum necessary to accomplish an intended purpose … is a key component of health information privacy." 410 ILCS 513/5(5).

38.     The Illinois Legislature amended GIPA in 2008 to increase its protections and harmonize Illinois state law with the then-recently passed Federal Genetic Information Nondiscrimination Act of 2008 ("**GINA**"), 110 P.L. 233; *see also* 42 U.S.C. § 2000ff. The 2008 amendments to GIPA sought to further bar the practices of employers relating to the use of genetic information of employees, including such employees' family medical history.

39.     During discussions of the 2008 GIPA amendments, the Illinois Legislature recognized the importance of safeguarding family medical history due to the fact that it is akin to

---

[5] Nicholas Wade, *Scientists Complete Rough Draft of Human Genome*, NEW YORK TIMES (June 26, 2000), *available online at*: https://archive.nytimes.com/www.nytimes.com/library/national/science/062600sci-human-genome.html?amp;sq=francis%252520collins&st=cse&scp=23.

knowledge of genetic predispositions:

> I hope the [legislature] understands the importance of [family medical history]; it's becoming more and more important. Back in '96 or '97, I had a third generation ovarian cancer survivor that came to me with this issue. … If a woman has … the gene that causes breast cancer, she can have up to an 84 percent probability that she will develop breast cancer sometime in her life … it's important that we help people be able to know that information and know they won't be discriminated against in their employment …. Quite honestly, with genetic information we have today, we could identify a pool of people that … no one would want to employ. [GIPA] helps guarantee that we don't have that kind of discrimination occur.

Illinois House Transcript, 2008 Reg. Sess. No. 276, pp. 33-34.

40.     GIPA bars companies such as Defendant from sharing genetic testing and information with unauthorized third parties. Specifically, GIPA states: "Except as otherwise provided in this Act, genetic testing and information derived from genetic testing is confidential and privileged and may be released only to the individual tested and to persons specifically authorized, in writing in accordance with Section 30, by that individual to receive the information." 410 ILCS 513/15(a).

41.     GIPA further provides: "No person may disclose or be compelled to disclose the identity of any person upon whom a genetic test is performed or the results of a genetic test in a manner that permits identification of the subject of the test[.]" 410 ILCS 513/30(a).

42.     In order to enforce these and other requirements, GIPA provides individuals with a broad private right of action, stating: "Any person aggrieved by a violation of this Act shall have a right of action … against an offending party."  410 ILCS 513/40(a). Under this private right of action, a party may recover, for each violation: (a) $2,500 or actual damages, whichever is greater, for a negligent violation, or $15,000 or actual damages, whichever is greater, for a willful violation; (b) reasonable attorneys' fees; and (c) "[s]uch other relief, including an injunction, as the … court

may deem appropriate." *Id.*

43.     Plaintiff is not required to allege or prove actual damages in order to state a claim under GIPA, and they can seek statutory damages under GIPA as compensation for the injuries caused by Defendant. *See Rosenbach v. Six Flags Ent. Corp.*, 2019 IL 123186, at ¶ 40, 432 Ill. Dec. 654, 129 N.E.3d 1197 (holding by the Illinois Supreme Court that "an individual need not allege some actual injury or adverse effect, beyond violation of his or her rights under [the Illinois Biometric Privacy Act ("**BIPA**")] in order to qualify as an 'aggrieved person' under BIPA); *see also Bridges v. Blackstone Grp., Inc.*, 2022 U.S. Dist. LEXIS 121205, at *8 (S. D. Ill. July 8, 2022) (holding that it is appropriate to apply BIPA's definition of "aggrieved person" used by the *Rosenbach* court to alleged violations of GIPA).

44.     Thus, GIPA provides valuable privacy rights, protections, and benefits to the citizens of Illinois and provides those citizens with the means to aggressively enforce those rights.

## FACTUAL ALLEGATIONS

### A.  DEFENDANT'S USE OF THIRD-PARTY TRACKING TECHNOLOGIES

#### a.  Google's Mass Advertising Surveillance Operation

45.     Google is the largest digital advertiser in the country, accounting for 26.8 percent of the total digital advertising revenue generated in the United States.[6] In 2023, Google's advertising revenue of $238 billion accounted for 77-percent of its total revenue for the year.[7]

---

[6] *Share of major ad-selling companies in digital advertising revenue in the United States*, STATISTA (May 2024), https://www.statista.com/statistics/242549/digital-ad-market-share-of-major-ad-selling-companies-in-the-us-by-revenue/#:~:text=In%202023%2C%20Google%20accounted%20for,21.1%20and%2012.5%20percent%2C%20respectively https://www.scientificamerican.com/article/7-in-10-smartphone-apps-share-your-data-with-third-party-services/ (last visited Jan. 10, 2025).

[7]     Florian Zandt, *Google's Ad Revenue Dwarfs Competitors*, STATISTA (Sep. 10, 2024), https://www.statista.com/chart/33017/annual-advertising-revenue-of-selected-tech-companies-offering-

46.     Google advertises Google Analytics and other Business Tools to website operators, like Defendant, claiming they will allow the operator to "[u]nderstand [their] site and app users," "check the performance of [their] marketing," and "[g]et insights only Google can give."[8] But, in order for website operators to get information from Google Analytics about their website's visitors, they must allow data collection through installation of Google's Tracking Tools on their website.[9]

47.     Indeed, on its *Privacy & Terms* page, Google admits that it collects information from third party websites, stating that: "[m]any websites and apps use Google services to improve their content and keep it free. When they integrate our services, these sites and apps share information with Google."[10]

48.     Google also admits that it uses the information collected from third party websites, such as Defendant's, to sell targeted advertising, explaining to users that: "[f]or example, a website that sells mountain bikes might use Google's ad services. After you visit that site, you could see an ad for mountain bikes on a different site that shows ads served by Google."[11]

49.     While Google admits that it collects information from third-party websites through the Tracking Tools, it does not provide, nor could it provide, a publicly available list of every webpage on which its Tracking Tools are installed. As such, the vague descriptions of Google's

---

search-solutions/#:~:text=Online%20advertising&text=Alphabet%2C%20the%20company%20behind%20the,overall%20revenue%20this%20past%20year (last visited Jan. 10, 2025).

[8]     *Welcome to Google Analytics*, GOOGLE, https://analytics.google.com/analytics/web/provision/?authuser=0#/provision (last visited Jan. 10, 2025).

[9] *See* Aaron Ankin & Surya Matta, *The High Privacy Cost of a "Free" Website*, THE MARKUP, https://themarkup.org/blacklight/2020/09/22/blacklight-tracking-advertisers-digital-privacy-sensitive-websites (last visited Jan. 10, 2025).

[10] *Privacy & Terms – How Google uses information from sites or apps that use our services*, GOOGLE, https://policies.google.com/technologies/partner-sites (last visited Jan. 10, 2025).

[11] *Id.*

data collection practices referenced above could not give Plaintiff and Class Members any reason to think that Defendant was part of Google's surveillance network. Moreover, as Defendant does not disclose its use of Google's Tracking Tools, Plaintiff and Class Members could not have been reasonably expected to review any of Google's privacy statements in connection with their use of the Website

50.     Google aggregates the user information that it collects from third-party websites into 'advertising profiles' consisting of all of the data that it has collected about a given user.[12] With these advertising profiles, Google can sell hyper-precise advertising services, allowing its clients to target internet users based on combinations of their location, age, race, interests, hobbies, life events (e.g., recent marriages, graduation, or relocation), political affiliation, education level, home ownership status, marital status, household income, type of employment, use of specific apps or websites, and more.[13]

51.     Google's surveillance of individual's internet usage is ubiquitous. In 2017, Scientific American reported that over 70-percent of smartphone apps report "personal data to third-party tracking companies like Google,"[14] and Google trackers are present on 74-percent of all web traffic.

52.     Moreover, as in this case, the data collected by Google often pertains to the most

---

[12] Bennett Cyphers & Gennie Gebhart, *Behind the One-Way Mirror: A Deep Dive Into the Technology of Corporate Surveillance*, ELECTRONIC FRONTIER FOUNDATION (2019), *available online at*: https://www.eff.org/files/2019/12/11/behind_the_one-way_mirror-a_deep_dive_into_the_technology_of_corporate_surveillance_0.pdf.

[13] *About audience segments*, GOOGLE ADS, https://support.google.com/google-ads/answer/2497941?hl=en#zippy=%2Cin-market-segments%2Caffinity-segments%2Clife-events%2Cdetailed-demographics (last visited Jan. 10, 2025).

[14] Narseo Vallina-Rodriguez & Srikanth Sundaresan*, 7 in 10 Smartphone Apps Share Your Data with Third-Party Services*, SCIENTIFIC AMERICAN (May 30, 2017), https://www.scientificamerican.com/article/7-in-10-smartphone-apps-share-your-data-with-third-party-services/ (last visited Jan. 10, 2025).

personal and sensitive aspects of an individual's life. For example:

    i.    93-percent of pornography websites allow third parties, including Google, to collect their user's browsing habits.[15] In fact, Google advertising trackers were found on 73-percent of pornography websites.[16]

    ii.    81-percent of the most popular mobile apps for managing depression and quitting smoking allowed Facebook and/or Google to access subscriber information, including health diary entries and self-reports about substance abuse.[17]

    iii.    Twelve of the largest pharmacy providers in the United States send information regarding user's purchases of products such as pregnancy tests, HIV tests, prenatal vitamins, and Plan B to online advertisers.[18] For example, when an online shopper searches for a pregnancy test, views the product page for a pregnancy test, or adds a pregnancy test to their online shopping cart on Kroger's website, that information is transmitted to Google.[19]

53.    This monumental, invasive surveillance of Americans' internet usage is not accidental. As Google's then-CEO Eric Schmidt admitted in 2010: "We know where you are. We know where you've been. We can more or less know what you're thinking about."[20]

54.    In fact, Google values user information so highly that it provides its Business Tools

---

[15] Elena Maris, Timothy Libert & Jennifer R. Henrichsen, *Tracking sex: The implications of widespread sexual data leakage and tracking on porn websites*, NEW MEDIA & SOCIETY (2020), *available online at*: https://journals.sagepub.com/doi/10.1177/1461444820924632 (last visited Jan. 10, 2025).

[16] *Id.*

[17] Kit Huckvale, John Torous & Mark E. Larsen, *Assessment of the Data Sharing and Privacy Practices of Smartphone Apps for Depression and Smoking Cessation*, JAMA NETWORK OPEN (2019), *available online at*: https://pubmed.ncbi.nlm.nih.gov/31002321/ (last visited Jan. 10, 2025).

[18] Darius Tahir & Simon Fondrie-Teitler*, Need to Get Plan B or an HIV Test Online? Facebook May Know About It*, THE MARKUP (June 30, 2023), https://themarkup.org/pixel-hunt/2023/06/30/need-to-get-plan-b-or-an-hiv-test-online-facebook-may-know-about-it (last visited Jan. 10, 2025).

[19] Jon Keegan, *Forget Milk and Eggs: Supermarkets Are Having a Fire Sale on Data About You*, THE MARKUP (Feb. 16, 2023), https://themarkup.org/privacy/2023/02/16/forget-milk-and-eggs-supermarkets-are-having-a-fire-sale-on-data-about-you (last visited Jan. 10, 2025).

[20] Andrew Orlowski, *Google's Schmidt: We know what you're thinking*, THE REGISTER (Oct. 4, 2020), https://www.theregister.com/2010/10/04/google_ericisms/ (last visited Jan. 10, 2025).

to many website operators for free, all to expand its surveillance apparatus.[21]

55.     When website operators, like Defendant, make use of Google's Business Tools, they are essentially choosing to participate in Google's mass surveillance network, and in return they benefit from Google's collection of user data, at the expense of their website users' privacy. For example, Google rewards website operators for providing it with their user's information by granting access to its Analytics platform, which leverages demographic data collected by Google to provide detailed analyses of the website's user base.[22]

56.     In many cases, a website operator's use of third-party tracking software is not disclosed whatsoever in its privacy policy.[23] Even where the use of such third-party software is disclosed, such disclosures are often hidden and cloaked in such confusing, technical and overly legal language as to be indecipherable to the typical internet user.[24]

57.     Moreover, for even a conscientious internet user, the massive volume of privacy policies encountered through routine internet use makes reviewing each and every one practically impossible. According to one study, it would take the average internet user 244 hours – or 30.5 working days – to read the privacy policy of every new website that they visited in a single year.[25]

---

[21] *Analytics Overview*, GOOGLE, https://marketingplatform.google.com/about/analytics/ (last visited Jan. 10, 2025) ("Google Analytics gives you the tools, free of charge").

[22] *Google Marketing Platform – Features*, GOOGLE, https://marketingplatform.google.com/about/analytics/features/ (last visited Jan. 10, 2025).

[23] *See* Woodrow Hartzog, *Privacy's Blueprint*, 60-67 (Harvard University Press 2018) (detailing deficiencies with online privacy policies).

[24] *Id*.

[25] Aleecia M. McDonald & Lorrie Faith Cantor, *The Cost of Reading Privacy Policies*, I/S: A JOURNAL OF LAW AND POLICY FOR THE INFORMATION SOCIETY (2008), *available online at*: https://lorrie.cranor.org/pubs/readingPolicyCost-authorDraft.pdf.

**b. Pixels Can Record Almost Every Interaction Between a User and a Website**

58.   In order to use Google's Business Tools, Defendant installed Google's Tracking Tools, including tracking Pixels, onto its website.

59.   Pixels are one of the tools used by website operators to track user behavior. As the Federal Trade Commission ("FTC") explains, a Pixel is:

> [A] small piece of code that will be placed into the website or ad and define [the Pixel operator's] tracking goals such as purchases, clicks, or pageviews…
>
> Pixel tracking can be monetized several ways. One way to monetize pixel tracking is for companies to use the tracking data collected to improve the company's own marketing campaigns…Another is that companies can monetize the data collected by further optimizing their own ad targeting systems and charging other companies to use its advertising offerings.[26]

60.   Pixels can collect a shocking amount of information regarding an individual's online behavior, including the webpages viewed by the user, the amount of time spent by the user on specific webpages, the buttons and hyperlinks that the user clicks while using a website, the items that the user adds to an online shopping cart, the purchases that a user makes through an online retailer, the text entered by the user into a website search bar, and even the information provided by the user on an online form.[27]

61.   But most internet users are completely unaware that substantial information about their internet usage is being collected through tracking Pixels. The FTC warns that:

> Traditional controls such as blocking third party cookies may not entirely

---

[26] *Lurking Beneath the Surface: Hidden Impacts of Pixel Tracking*, FEDERAL TRADE COMMISSION – OFFICE OF TECHNOLOGY (Mar. 6, 2023), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking (last visited Jan. 10, 2025).

[27] *See id.*; *How does retargeting on Facebook help your business?*, META, https://www.facebook.com/business/goals/retargeting (last visited Jan. 10, 2025); Tom Kemp, *"Oops! I Did It Again" … Meta Pixel Still Hoovering Up Our Sensitive Data*, MEDIUM, https://tomkemp00.medium.com/oops-i-did-it-again-meta-pixel-still-hoovering-up-our-sensitive-data-f99c7b779d47#_ftn1 (last visited Jan. 10, 2025).

prevent pixels from collecting and sharing information. Additionally, many consumers may not realize that tracking pixels exist because they're invisibly embedded within web pages that users might interact with…Academic and public reporting teams have found that thousands of the most visited webpages have pixels and other methods that leak personal information to third parties.[28]

**c.  The Pixels Installed on Defendant's Website Transmit Personally Identifiable Information to Google**

62.     Every website is hosted by a computer "server" that holds the website's contents.

63.     To access a website, individuals use "web browsers." Web browsers are software applications that allow consumers to navigate the web and view and exchange electronic information and communications over the Internet.  Each "client device" (such as computer, tablet, or smartphone) accesses web content through a web browser (such as Google's Chrome, Mozilla's Firefox, Apple's Safari, or Microsoft's Edge).

64.     Communications between a website server and web browser consist of Requests and Responses. Any given browsing session may consist of hundreds or even thousands of individual Requests and Responses. A web browser's Request essentially asks the website to provide certain information, such as the contents of a given webpage when the user clicks a link, and the Response from the website sends back the requested information – the web pages' images, words, buttons, and other features that the browser shows on the user's screen as they navigate the website.

65.     Additionally, on most websites, the Response sent back to the user's web browser directs the browser to create small files known as 'cookies' on the user's device.[29] These cookies

---

[28] *Lurking Beneath the Surface, supra* note 27.

[29] *What is a web browser?*, MOZILLA, https://www.mozilla.org/en-US/firefox/browsers/what-is-a-browser/ (last visited Jan. 10, 2025).

are saved by the user's web browser, and are used to identify the website user as they browse the website or on subsequent visits to the site.[30] For example, in a more innocuous use case, a cookie may allow the website to remember a user's name and password, language settings, or shopping cart contents.[31]

66.     When a Google user logs onto their account, their web browser records a Google tracking cookie.[32] This cookie includes a specific line of code that links the web browser to the user's Google account.[33]

67.     Google's Pixels use cookies but operate differently than cookies.   Rather than directing the browser to save a file on the user's device, the Pixels acquires information from the browser, without notifying the user.   The information can include details about the user, his or her interactions with the Website, and information about the user's environment (*e.g.,* type of device, type of browser, and sometimes even the physical location of the device).

68.     Simultaneously, the Google Pixels, like those installed on Defendant's Website, request identifying information from any Google cookies previously installed on the user's web browser.

69.     The Pixel then combines the data it received from the browser with the data it acquired from the cookie and instructs the web browser to transmit the information back to Google. As a result, Google can link all of the user information collected by their Pixels on the Defendant's Website to the user's identity, via the user's Google profile.   Thus, even if a user never actually

---

[30] *Id.*

[31] *Id.*

[32] Cyphers, *supra* note 13.

[33] *Id.*

logs into a website, or fills out a form, the website, along with Google, can know the user's identity.

70.     A remarkable number of Americans possess a Google account. Just one of Google's many products, its Gmail e-mail client, is used by over one-third of Americans.[34] When these users visit a website, like Defendant's, that utilizes a Google Pixel, any information collected by the Pixel can be linked to the user's identity through the Google cookies installed on the user's web browser.

71.     However, it is not only Google account holders that are at risk of having Pixel-collected website data linked to their identities. Rather, Google utilizes sophisticated data tracking methods to identify even those few users who do not have a Google account.

72.     Google's Pixels, like those on Defendant's website, can acquire information about the user's device and browser, such as their screen resolution, time zone setting, browser software type and version, operating system type and version, language setting, and IP address.

73.     An internet user's combination of such device and browser characteristics, commonly referred to as their "browser fingerprint," is "often unique."[35] By tracking this browser fingerprint, Google is able to compile a user's activity across the internet.[36] And, as Google continuously compiles user data over time, its understanding of the user's browser fingerprint becomes more sophisticated such that it needs only to collect a single piece of identifying information to identify the user linked to a browser fingerprint.

---

[34] *See* Harsha Kiran, *49 Gmail Statistics To Show How Big It Is In 2024*, TECHJURY (Jan. 3, 2024), https://techjury.net/blog/gmail-statistics/ (last visited Jan. 10, 2025) ("Gmail accounts for 130.9 million of the total email users in the US"). The United States population is approximately 337.4 million. *See* UNITED STATES CENSUS BUREAU, https://www.census.gov/popclock/ (last visited Jan. 10, 2025).

[35] Cyphers, *supra* note 13.

[36] *Id*.

**d. Defendant Disclosed Plaintiff's and Class Members' Genetic Testing Information to Google**

74. Defendant's genetic testing service uses genomic testing to generate information on a customer's ancestry, ancestral origin, DNA relatives, and health traits and predispositions. To use Defendant's genetic testing service, consumers purchase one of Defendant's test kits through its Website or a third-party retailer and provide a saliva sample to the Defendant for its analysis.

75. To receive their genetic testing results, Defendant's customers, like Plaintiff and Class Members, are required to register on Defendant's Website. When Defendant completes its genetic analysis, Defendant's customers must log into its Website portal to view their genetic testing results.

76. Defendant's genetic test provides Defendant's customers with several different data points, including their ancestral ethnicity groups, and identification of potential relatives who have also taken a MyHeritage genetic test.

77. Unbeknownst to Plaintiff and Class Members, Defendant intentionally configured the Pixels installed on its Website to capture and transmit their genetic testing results to unauthorized third parties, including Google.

78. For example, the following screenshot ("Figure 1") shows that when Defendant's customers, including Plaintiff and Class Members, view their DNA match analysis, the information requested and transmitted to Google by the Pixels installed on Defendant's website include the fact that the customer is viewing their "DNA Results," as well as their last name (in this case, "Singh").

79. Further, the information transmitted to Google was accompanied by specific lines of code linking the information transmitted to Google to the user's identity. As Figure One shows, Defendant's website transmitted the identifier number attached to Google's '_cid' and '_gid' cookies, which identify the user's Google account. Defendant's website also transmitted

information that is commonly used to create a browser fingerprint, such as the user's language selection, screen resolution, location, and IP address information.



cd6: 1
cd7: US
cd8: 82
cd9: 0
cd10: no_free_trial
cd12: 1
cd13: -basic
cd14: is_site_creator
cd15: 21
cd16: https://www.myheritage.com/dna/matches/1666580790
cd17: /family/dna-matches.php
cd23: user
cd24: user
cd26: -
cd27: -
cd28: -
cd29: -
cd30: DC
cd31: 1
cd39: 66E21054882A80D993822C37428087C7
cd41: 0A810191:8DE4_0A81021A:1F90_672CEB0A_28CC513E:2C51
cd44: user
cd45: user
cd46: 1
cd48:
cd49:
cd52: 0
cd64:
cd83: 00000000
cd85: gtm.js
gcd: 131313131111
dma: 0
tag_exp: 101823848~101925629
z: 1670844824

*Figure 1. Screenshot depicting back-end network traffic from Defendant's Website which show information transmitted to Google, including identifiable user IDs and the distinct URL containing the results of the genetic test (highlighted).*

80.    Likewise, when Defendant's customers view their ancestry analysis, Defendant's website transmits the results of their genetic test to Google. As the following screenshot ("Figure 2") shows, when Defendant's customers view their ancestry analysis, Defendant's website transmits the user's result to Google – in this case, the user's designation as belonging to the 'South Asian' genetic group. Along with the user's ancestry designation, Defendant also transmitted the identifying information linked to Google's '_cid' and '_gid' cookies, the user's last name, and information commonly used to generate a browser fingerprint, such as the user's language selection, screen resolution, location, and IP address information.

21



*Figure 2. Screenshot depicting back-end network traffic from Defendant's Website which shows information transmitted to Google, including specific genetic information (highlighted).*

81.     By installing third-party Tracking Tools, including tracking Pixels, on its Website, Defendant knowingly and intentionally caused Plaintiff's and Class Members' Genetic Testing Information to be transmitted to third parties, including Google.

B.  **DEFENDANT DISCLOSED PLAINTIFF'S AND CLASS MEMBERS' SENSITIVE INFORMATION TO THIRD PARTIES WITHOUT THEIR KNOWLEDGE OR CONSENT**

    a.  **Defendant failed to inform Plaintiff's and Class Members' of its disclosure of their Genetic Testing Information to Third Parties, in violation of its Privacy Statement.**

82.    Defendant's Privacy Statement informs its customers, that "MYHERITAGE HAS NEVER SOLD OR LICENSED GENETIC DATA OR HEALTH DATA, AND WILL NEVER DO SO IN THE FUTURE" and that "MyHeritage has never sold or licensed personal data (like customer names, email addresses, residence addresses and family trees) and will never do so in the future."[37]

83.    These statements were lies. In truth, Defendant breached Plaintiff's and Class Members' right to privacy by unlawfully disclosing their Genetic Testing Information to third parties, including Google.

84.    Plaintiff and Class Members had a reasonable expectation of privacy, based partly on Defendant's own representations to Plaintiff and the Class, that Defendant would not disclose their Genetic Testing Information to third parties. Defendant did not inform Plaintiff that it was sharing their Genetic Testing Information with third parties, including Google.

85.    By engaging in this improper sharing of their Genetic Testing Information without Plaintiff's and Class Members' consent, Defendant violated its own Privacy Statement and breached Plaintiff's and Class Members' right to privacy, including under GIPA, by unlawfully disclosing their use of its genetic testing service and the results of their genetic testing.

86.    Despite never telling users like Plaintiff and Class Members, Defendant allowed third parties such as Google to intercept Plaintiff's and Class Members' Genetic Testing

---

[37] *Privacy Policy*, MYHERITAGE, https://www.myheritage.com/privacy-policy (last visited Jan. 8, 2025).

Information and use it for advertising purposes.

87.    Despite a lack of disclosure, Defendant allowed third parties such as Google to intercept Plaintiff's and Class Members' Genetic Testing Information, and use it for advertising purposes, in violation of its own Privacy Statement.

## C. DEFENDANT WAS ENRICHED BY ITS DISCLOSURE OF PLAINTIFF'S AND CLASS MEMBERS' SENSITIVE INFORMATION TO THIRD PARTIES

### a. Defendant Received Material Benefits in Exchange for Plaintiff's Genetic Testing Information

88.    As explained, *supra*, users of Google's Business Tools, like Defendant, receive access to advertising and marketing analytics services in exchange for installing Google's Tracking Tools on their website.

89.    Upon information and belief, Defendant, as a user of Google's Business Tools, received compensation in the form of advanced advertising services and cost-effective marketing on third-party platforms in exchange for allowing Google to collect Plaintiff's and Class Members' Genetic Testing Information.

### b. Plaintiff's and Class Members' Data Had Financial Value

90.    Moreover, Plaintiff's and Class Members' Genetic Testing Information had value and Defendant's disclosure, and interception of that Genetic Testing Information harmed Plaintiff and the Class.

91.    According to the financial statements of Facebook, another major seller of online advertisements, the value derived from user data has continuously risen. "In 2013, the average American's data was worth about $19 per year in advertising sales to Facebook, according to its

financial statements. In 2020, [it] was worth $164 per year."[38]

92.     Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.

93.     Several companies have products through which they pay consumers for a license to track certain information. Google, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies that pay for browsing history information.

94.     The unauthorized disclosure of Plaintiff's and Class Members' private and Genetic Testing Information has diminished the value of that information, resulting in harm to Plaintiff and Class Members.

## D.  PLAINTIFF'S AND CLASS MEMBERS' REASONABLE EXPECTATION OF PRIVACY

95.     At all times when Plaintiff and Class Members provided their Genetic Testing Information to Defendant, they each had a reasonable expectation that the information would remain confidential and that Defendant would not share their Genetic Testing Information with third parties for a commercial purpose, unrelated to providing the DNA analysis that Plaintiff and Class Members contracted with Defendant to receive.

96.     Privacy polls and studies show that an overwhelming majority of Americans consider obtaining an individual's affirmative consent before a company collects and shares that individual's data to be one of the most important privacy rights.

97.     For example, a recent Consumer Reports study shows that 92-percent of Americans

---

[38] Geoffrey A. Fowler, *There's no escape from Facebook, even if you don't use it*, THE WASHINGTON POST (Aug. 29, 2021), https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/ (last visited Jan. 10, 2025).

believe that internet companies and websites should be required to obtain consent before selling or sharing consumer data, and the same percentage believe those companies and websites should be required to provide consumers with a complete list of the data that is collected about them.[39]

98.     With regards to genetic testing specifically, the top two factors that Americans state as being important in making the "decision to participate in genetic research" are "[c]onfidentiality: knowing that your information will not be shared without your consent" and "[p]rivacy: knowing that your information will not be shared publicly.[40] In fact, more than half of Americans believe that the results of DTC genetic testing should not even be shared with law enforcement for the purpose of helping to solve crimes.[41]

99.     Personal data privacy and obtaining consent to share Genetic Testing Information are material to Plaintiff and Class Members.

## TOLLING AND ESTOPPEL

100.     Any applicable statutes of limitation have been tolled by Defendant's knowing and active concealment of its incorporation of Google's Tracking Tools into its website.

101.     The Pixels and other tracking tools on Defendant's Website were and are invisible to the average website visitor.

102.     Through no fault or lack of diligence, Plaintiff and Class Members were deceived

---

[39] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, CONSUMER REPORTS (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907 (last visited Jan. 10, 2025).

[40] *U.S. Public Views of Genetics: An ASHG Survey*, AMERICAN SOCIETY OF HUMAN GENETICS (Jan. 29, 2020), *available online at*: https://www.ashg.org/discover-genetics/public-views-of-genetics-survey/.

[41] Andrew Perrin, *About half of Americans are OK with DNA testing companies sharing user data with law enforcement*, PEW RESEARCH (Feb. 4, 2020), https://www.pewresearch.org/short-reads/2020/02/04/about-half-of-americans-are-ok-with-dna-testing-companies-sharing-user-data-with-law-enforcement/ (last accessed Jan. 8, 2025).

and could not reasonably discover Defendant's deception and unlawful conduct.

103. Plaintiff was ignorant of the information essential to pursue their claims, without any fault or lack of diligence on their part.

104. Defendant had exclusive knowledge that its Website incorporated the Pixels and other Tracking Tools and yet failed to disclose to customers, including Plaintiff and Class Members, that by allowing Genetic Testing Information to be uploaded to Defendant's Website, Plaintiff's and Class Members' Genetic Testing Information would be disclosed or released to unauthorized third parties, including Google.

105. Under the circumstances, Defendant was under a duty to disclose the nature, significance, and consequences of its collection and treatment of its customers' Genetic Testing Information. In fact, to the present Defendant has not conceded, acknowledged, or otherwise indicated to its customers that it has disclosed or released their Genetic Testing Information to unauthorized third parties. Accordingly, Defendant is estopped from relying on any statute of limitations.

106. Moreover, all applicable statutes of limitation have also been tolled pursuant to the delayed discovery rule.

107. The earliest that Plaintiff or Class Members, acting with due diligence, could have reasonably discovered Defendant's conduct would have been shortly before the filing of this Complaint.

## **CLASS ACTION ALLEGATIONS**

108. The Nationwide Class that Plaintiff seeks to represent is defined as follows:

### **The Nationwide Class**

All natural persons who used Defendant's Website to view their genetic testing results and whose Genetic Testing Information was disclosed or transmitted to Google or any other unauthorized third party.

27

109. In addition to the claims asserted on behalf of the Nationwide Class, Plaintiff asserts claims on behalf of a separate Illinois Subclass, which are defined as follows:

**Illinois Subclass**

All natural persons residing in Illinois who used Defendant's Website to view their genetic testing results and whose Genetic Testing Information was disclosed or transmitted to Google or any other unauthorized third party.

110. Excluded from the proposed Class are any claims for personal injury, wrongful death, or other property damage sustained by the Class; and any Judge conducting any proceeding in this action and members of their immediate families.

111. Plaintiff reserves the right to amend the definitions of the Class or add subclasses if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

112. **Numerosity.** The Class is so numerous that the individual joinder of all members is impracticable. There are at least 10,000 individuals that have been impacted by Defendant's actions. Moreover, the exact number of those impacted is generally ascertainable by appropriate discovery and is in the exclusive control of Defendant.

113. **Commonality.** Common questions of law or fact arising from Defendant's conduct exist as to all members of the Class, which predominate over any questions affecting only individual Class Members. These common questions include, but are not limited to, the following:

    a) Whether and to what extent Defendant had a duty to protect the Genetic Testing Information of Plaintiff and Class Members;

    b) Whether Defendant had duties not to disclose the Genetic Testing Information of Plaintiff and Class Members to unauthorized third parties;

    c) Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their Genetic Testing Information

28

would be disclosed to third parties;

d)      Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their Genetic Testing Information was being disclosed without their consent;

e)      Whether Defendant adequately addressed and fixed the practices which permitted the unauthorized disclosure of patients' Genetic Testing Information;

f)      Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to keep the Genetic Testing Information belonging to Plaintiff and Class Members free from unauthorized disclosure;

g)      Whether Defendant violated the statutes asserted as claims in this Complaint;

h)      Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

i)      Whether Defendant knowingly omitted material representations with respect to their data security and/or privacy policy practices; and

j)      Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Defendant's disclosure of their Genetic Testing Information.

114.     **Typicality.** Plaintiff's claims are typical of those of other Class Members because Plaintiff's Genetic Testing Information, like that of every other Class Member, was compromised as a result of Defendant's incorporation and use of the Tracking Tools.

115.     **Adequacy.** Plaintiff will fairly and adequately represent and protect the interests of the members of the Class in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the members of the Class and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

116.   **Predominance**. Defendant has engaged in a common course of conduct toward Plaintiff and Class Members in that all the Plaintiff's and Class Members' data was unlawfully stored and disclosed to unauthorized third parties, including third parties, including Google, in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

117.   **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claim is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

118.   Defendant acted on grounds that apply generally to the Class as a whole so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

119.   Likewise, particular issues under Fed. R. Civ. P. 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a)  Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Genetic Testing Information and not disclosing it to unauthorized third parties;

b)  Whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Genetic Testing Information;

c)  Whether Defendant failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security;

d)  Whether Defendant adequately and accurately informed Plaintiff and Class Members that their Genetic Testing Information would be disclosed to third parties;

e)  Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties;

f)  Whether Class Members are entitled to actual, consequential, and/or nominal damages and/or injunctive relief as a result of Defendant's wrongful conduct.

120.  Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the unauthorized disclosures that have taken place.

## COUNT I
## VIOLATIONS OF ILLINOIS GENETIC INFORMATION PRIVACY ACT
## 410 ILCS 513/15
## FAILURE TO MAINTAIN CONFIDENTIALITY OF GENETIC INFORMATION
### *(On Behalf of Plaintiff and Illinois Subclass)*

121.  Plaintiff repeats and realleges the allegations contained in the preceding paragraphs as if fully set forth herein.

122.  Plaintiff and Illinois Subclass Members were asked to provide, and did provide, their genetic information to Defendant for the purpose of a genetic test.

123.  Defendant, or an agent acting on its behalf, released information derived from

31

Plaintiff's and Illinois Subclass Members' genetic tests to unauthorized third parties for the purpose of sending Plaintiff targeted advertisements.

124.    Defendant, or an agent acting on its behalf, disclosed the results of their genetic tests in a manner that permitted identification of Plaintiff and Illinois Subclass Members to unauthorized third parties, for the purpose of sending Plaintiff and Illinois Subclass Members targeted advertisements.

125.    Plaintiff and Illinois Subclass Members did not provide specific written authorization for Defendant to share information derived from Plaintiff's and Illinois Subclass Members' genetic tests with any third party.

126.    Plaintiff and Illinois Subclass Members were aggrieved by Defendant's violations of their statutorily protected rights to privacy in their genetic information, as set forth in GIPA, when Defendant disclosed information derived from their genetic tests with unauthorized third parties in a manner that permitted the third parties to identify the subject of the genetic test results.

127.    By disclosing information derived from the genetic tests of Plaintiff and Illinois Subclass Members with unauthorized third parties as described herein, Defendant violated Plaintiff's and Illinois Subclass Members' rights to privacy in their genetic information as set forth in GIPA.

128.    Because Defendant knew, or reasonably should have known, that disclosing information derived from the genetic tests of Plaintiff and Illinois Subclass Members with unauthorized third parties violated GIPA, its actions in violating GIPA were willful.

129.    On behalf of herself and the proposed Illinois Subclass Members, Plaintiff seeks: (1) declaratory relief; (2) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the proposed Class by requiring Defendant to comply with GIPA as described herein;

(3) statutory damages of $15,000 or actual damages, whichever is greater, for each intentional and/or reckless violation of GIPA pursuant to 410 ILCS 513/40(2) or, in the alternative, statutory damages of $2,500 or actual damages, whichever is greater, for each negligent violation of GIPA pursuant to 410 ILCS 513/40(1); and (4) reasonable attorneys' fees and costs and other litigation expenses pursuant to 410 ILCS 513/40(3).

<u>**COUNT II**</u>
**VIOLATIONS OF ILLINOIS GENETIC INFORMATION PRIVACY ACT**
**410 ILCS 513/30**
**UNAUTHORIZED DISCLOSURE OF GENETIC TEST RESULTS AND IDENTITIES**
*<u>(On Behalf of Plaintiff and Illinois Subclass)</u>*

130.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 129 as if fully set forth herein.

131.     Plaintiff and Illinois Subclass Members were asked to provide, and did provide, their genetic information to Defendant for the purpose of a genetic test.

132.     Defendant, or an agent acting on its behalf, released information derived from Plaintiff's and Illinois Subclass Members genetic tests to unauthorized third parties for the purpose of sending Plaintiff targeted advertisements.

133.     Defendant, or an agent acting on its behalf, disclosed the results of their genetic tests in a manner that permitted identification of Plaintiff and Illinois Subclass Members to unauthorized third parties, for the purpose of sending Plaintiff and Illinois Subclass Members targeted advertisements.

134.     Plaintiff and Illinois Subclass Members did not provide specific written authorization for Defendant to share information derived from Plaintiff's and Illinois Subclass Members' genetic tests with any third party.

135.     Plaintiff and Illinois Subclass Members were aggrieved by Defendant's violations

of their statutorily protected rights to privacy in their genetic information, as set forth in GIPA, when Defendant disclosed information derived from their genetic tests with unauthorized third parties in a manner that permitted the third parties to identify the subject of the genetic test results.

136. By disclosing information derived from the genetic tests of Plaintiff and Illinois Subclass Members with unauthorized third parties as described herein, Defendant violated Plaintiff's and Illinois Subclass Members' rights to privacy in their genetic information as set forth in GIPA.

137. Because Defendant knew, or reasonably should have known, that disclosing information derived from the genetic tests of Plaintiff and Illinois Subclass Members with unauthorized third parties violated GIPA, its actions in violating GIPA were willful.

138. On behalf of herself and the proposed Illinois Subclass Members, Plaintiff seeks: (1) declaratory relief; (2) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the proposed Class by requiring Defendant to comply with GIPA as described herein; (3) statutory damages of $15,000 or actual damages, whichever is greater, for each intentional and/or reckless violation of GIPA pursuant to 410 ILCS 513/40(2) or, in the alternative, statutory damages of $2,500 or actual damages, whichever is greater, for each negligent violation of GIPA pursuant to 410 ILCS 513/40(1); and (4) reasonable attorneys' fees and costs and other litigation expenses pursuant to 410 ILCS 513/40(3).

## COUNT III
### COMMON LAW INVASION OF PRIVACY - INTRUSION UPON SECLUSION
#### *(On Behalf of Plaintiff and the Nationwide Class or, alternatively, the Illinois Subclass)*

139. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 129 as if fully set forth herein.

140. Plaintiff and Class Members have an interest in: (1) precluding the dissemination

and/or misuse of their sensitive, highly personal Sensitive Information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to the exfiltration of their communications without Plaintiff's and Class Members' knowledge or consent.

141.    Plaintiff and Class Members had a reasonable expectation of privacy in their communications with Defendant via its Website and the communications platforms and services therein.

142.    Plaintiff and Class Members communicated Sensitive Information that they intended for only Defendant to receive and that they understood Defendant would keep private and secure.

143.    Defendant's disclosure of the substance and nature of those communications to third parties without the knowledge and informed consent of Plaintiff and Class Members is an intentional intrusion on Plaintiff's and Class Members' solitude or seclusion.

144.    Plaintiff and Class Members had a reasonable expectation of privacy given Defendant's Privacy Policy and other representations.

145.    Moreover, Plaintiff and Class Members have a general expectation that their communications regarding sensitive, highly personal information would be protected from surreptitious disclosure to third parties.

146.    Defendant's disclosure of Plaintiff's and Class Members' Sensitive Information coupled with individually identifying information is highly offensive to the reasonable person.

147.    As a result of Defendant's actions, Plaintiff and Class Members have suffered harm and injury including, but not limited to, an invasion of their privacy rights.

148.     Plaintiff and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to compensatory and/or nominal damages.

149.     Plaintiff and Class Members seek appropriate relief for that injury including, but not limited to, damages that will reasonably compensate Plaintiff and Class Members for the harm to their privacy interests as a result of the intrusions upon their privacy.

150.     Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful and intentional nature of Defendant's actions, directed at injuring Plaintiff and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

151.     Plaintiff also seek such other relief as the Court may deem just and proper.

**COUNT IV**
**BREACH OF CONFIDENCE**
***(On Behalf of Plaintiff and the Nationwide Class or, alternatively, the Illinois Subclass)***

152.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 129 as if fully set forth herein.

153.     Providers of genetic testing have a duty to their clients to keep non-public genetic information completely confidential.

154.     Plaintiff and Class Members had reasonable expectations of privacy in their communications exchanged with Defendant, including communications exchanged on Defendant's Website.

155.     Plaintiff's and Class Members' reasonable expectations of privacy in the communications exchanged with Defendant were further buttressed by Defendant's express promises in its Privacy Statement.

156.     Contrary to its duties as a genetic testing provider and its express promises of

confidentiality, Defendant deployed the Tracking Technologies to disclose and transmit Plaintiff's and Class Members' Genetic Testing Information and the contents of their communications exchanged with Defendant to third parties.

157. The third-party recipients included, but were not limited to, Google and other online marketers.

158. Defendant's disclosures of Plaintiff's and Class Members' Genetic Testing Information were made without their knowledge, consent or authorization, and were unprivileged.

159. The harm arising from a breach of provider-patient confidentiality includes erosion of the essential confidential relationship between the healthcare provider and the patient.

160. As a direct and proximate cause of Defendant's unauthorized disclosures of their personally identifiable, non-public Genetic Testing Information, Plaintiff and Class Members in that:

   a. Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

   b. Defendant eroded the essential confidential nature of the testee-tester relationship;

   c. Defendant took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without compensating Plaintiff and Class Members for the data;

   d. Plaintiff and Class Members did not get the full value of the testing services for which they paid, which included Defendant's duty to maintain confidentiality;

   e. Defendant's actions diminished the value of Plaintiff's and Class Members' Genetic Testing Information, and

   f. Defendant's actions violated the property rights Plaintiff and Class Members have in their Genetic Testing Information.

161. Plaintiff and Class Members are therefore entitled to general damages for invasion

of their rights in an amount to be determined by a jury and nominal damages for each independent violation. Plaintiff is also entitled to punitive damages.

## <u>COUNT V</u>
### NEGLIGENCE
### *<u>(On Behalf of Plaintiff and the Nationwide Class or, alternatively, the Illinois Subclass)</u>*

162.   Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 129 as if fully set forth herein.

163.   Through using Defendant's Website, Plaintiff and Class Members provided it with their Sensitive Information.

164.   By collecting and storing this data, Defendant had a duty of care to use reasonable means to secure and safeguard it from unauthorized disclosure to third parties.

165.   Defendant negligently failed to take reasonable steps to protect Plaintiff's and Class Members' Sensitive Information from being disclosed to third parties, without their consent, including to Google.

166.   Defendant further negligently omitted to inform Plaintiff and the Class that it would use their Sensitive Information for marketing purposes, or that their Sensitive Information would be transmitted to third parties.

167.   Defendant knew, or reasonably should have known, that Plaintiff and the Class would not have provided their Sensitive Information to Defendant, had Plaintiff and the Class known that Defendant intended to use that information for unlawful purposes.

168.   Defendant's conduct has caused Plaintiff and the Class to suffer damages by having their highly personal, personally identifiable Sensitive Information accessed, stored, and disseminated without their knowledge or consent.

169.   Plaintiff and Class Members are entitled to compensatory, nominal, and/or punitive

damages.

170.     Defendant's negligent conduct is ongoing, in that it still holds the Sensitive Information of Plaintiff and Class Members in an unsafe and unsecure manner. Therefore, Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) provide adequate credit monitoring to all Class Members.

**COUNT VI**
**BREACH OF IMPLIED CONTRACT**
***(On Behalf of Plaintiff and the Nationwide Class or, alternatively, the Illinois Subclass)***

171.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 129 as if fully set forth herein.

172.     When Plaintiff and Class Members provided their Sensitive Information to Defendant in exchange for services, they entered into an implied contract pursuant to which Defendant agreed to safeguard and not disclose their Sensitive Information without consent.

173.     Plaintiff and Class Members accepted Defendant's offers and provided their Sensitive Information to Defendant.

174.     Plaintiff and Class Members would not have entrusted Defendant with their Sensitive Information in the absence of an implied contract between them and Defendant obligating Defendant to not disclose Sensitive Information without consent.

175.     Defendant breached these implied contracts by disclosing Plaintiff's and Class Members' Sensitive Information to third parties like Google.

176.     As a direct and proximate result of Defendant's breaches of these implied contracts, Plaintiff and Class Members sustained damages as alleged herein.

177.   Plaintiff and Class Members would not have used Defendant's services or would have paid substantially less for those services, had they known their Sensitive Information would be disclosed.

178.   Plaintiff and Class Members are entitled to compensatory, consequential, and/or nominal damages as a result of Defendant's breaches of implied contract.

**COUNT VII**
**VIOLATIONS OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT**
**("ECPA"), 18 U.S.C. § 2511(1), *et seq*.**
**Unauthorized Interception, Use, and Disclosure**
***(On Behalf of Plaintiff and the Nationwide Class or, alternatively, the Illinois Subclass)***

179.   Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 129 as if fully set forth herein.

180.   The ECPA protects both sending and receipt of communications.

181.   18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

182.   The transmissions of Plaintiff's Genetic Testing Information to Defendant's Website qualify as "communications" under the ECPA's definition of 18 U.S.C. § 2510(12).

183.   <u>Electronic Communications</u>. The transmission of Genetic Testing Information between Plaintiff and Class Members and Defendant's Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

184.   <u>Content</u>. The ECPA defines content, when used with respect to electronic

communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

185.    Interception. The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

186.    Electronical, Mechanical or Other Device. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a.      Plaintiff's and Class Members' browsers;

b.      Plaintiff's and Class Members' computing devices;

c.      Defendant's web-servers; and

d.      The Pixel code deployed by Defendant to effectuate the sending and acquisition of patient communications.

187.    By utilizing and embedding the Pixels on its Website, Defendant intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiff and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

188.    Specifically, Defendant intercepted Plaintiff's and Class Members' electronic communications via the Pixels, which tracked, stored, and unlawfully disclosed Plaintiff's and Class Members' Genetic Testing Information to third parties such as Google.

189.    Defendant's intercepted communications include, but are not limited to, communications to/from Plaintiff and Class Members regarding their Genetic Testing Information.

190.    By intentionally disclosing or endeavoring to disclose the electronic

41

communications of Plaintiff and Class Members to third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

191.    By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiff and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

192.    <u>Unauthorized Purpose</u>. Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State—namely, invasion of privacy, among others.

193.    The ECPA provides that a "party to the communication" may liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. § 2511(2)(d).

194.    Defendant is not a party for purposes to the communication based on its unauthorized duplication and transmission of communications with Plaintiff and the Class. However, even assuming Defendant is a party, Defendant's simultaneous, unknown duplication, forwarding, and interception of Plaintiff's and Class Members' Genetic Testing Information does not qualify for the party exemption.

195.    Defendant's acquisition of sensitive communications that were used and disclosed to Google was done for purposes of committing criminal and tortious acts in violation of the laws of the United States and individual States nationwide as set forth herein, including:

a.      The Illinois Genetic Information Privacy Act, 410 ILCS 513/1, *et seq.*;

42

b.    The Illinois Eavesdropping Statute, 720 ILCS 5/14-1, *et seq.*;

c.    Invasion of privacy; and

d.    Breach of confidence.

196.    Defendant's conduct violated 42 U.S.C. § 1320d-6 in that it used and caused to be used cookie identifiers associated with specific users, including Plaintiff and Class Members, without user authorization; and disclosed Genetic Testing Information to Google without user authorization.

197.    Defendant is not exempt from ECPA liability under 18 U.S.C. § 2511(2)(d) on the ground that it was a participant in Plaintiff's and Class Members' communications about their Genetic Testing Information on its Website, because it used its participation in these communications to improperly share Plaintiff's and Class Members' Genetic Testing Information with Google and third-parties that did not participate in these communications, that Plaintiff and Class Members did not know were receiving their Genetic Testing Information, and that Plaintiff and Class Members did not consent to receive their Genetic Testing Information.

198.    As such, Defendant cannot viably claim any exception to ECPA liability.

199.    Plaintiff and Class Members have suffered damages as a direct and proximate result of Defendant's invasion of privacy in that:

a.    Learning that Defendant has intruded upon, intercepted, transmitted, shared, and used their Genetic Testing Information for commercial purposes has caused Plaintiff and Class Members to suffer emotional distress;

b.    Defendant received substantial financial benefits from its use of Plaintiff's and Class Members' Genetic Testing Information without providing any value or benefit to Plaintiff or Class Members;

c.    Defendant received substantial, quantifiable value from its use of Plaintiff's and Class Members' Genetic Testing Information, such as understanding how people use its Website and determining what ads people see on its Website, without providing any value or benefit to Plaintiff or Class

Members;

d. The diminution in value of Plaintiff's and Class Members' Genetic Testing Information and/or the loss of privacy due to Defendant making such Genetic Testing Information, which Plaintiff and Class Members intended to remain private, no longer private.

200. Defendant intentionally used the wire or electronic communications to increase its profit margins. Defendant specifically used the Pixels to track and utilize Plaintiff's and Class Members' Genetic Testing Information for financial gain.

201. Defendant was not acting under color of law to intercept Plaintiff's and the Class Members' wire or electronic communication.

202. Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading their privacy via the Pixels.

203. Any purported consent that Defendant may claim it received from Plaintiff and Class Members was not valid.

204. In sending and acquiring the content of Plaintiff's and Class Members' communications relating to the browsing of Defendant's Website, Defendant's purpose was tortious, criminal, and designed to violate federal and state legal provisions including a knowing intrusion into a private, place, conversation, or matter that would be highly offensive to a reasonable person.

205. As a result of Defendant's violation of the ECPA, Plaintiff and the Class are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs.

## COUNT VIII
### VIOLATIONS OF ILLINOIS EAVESDROPPING STATUTE
### 720 ILCS 5/14-1, *et seq.*
### (*On Behalf of Plaintiff and the Illinois Subclass*)

206.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 129 as if fully set forth herein.

207.     720 ILCS 5/14-2 prohibits any person from (1) using an eavesdropping device, in a surreptitious manner, to "record[] all or any part of any private conversation to which he or she is a party unless he or she does so with the consent of all other parties to the private conversation"; (2) "[i]ntercept[ing], record[ing], or transcrib[ing] in a surreptitious manner, any private electronic communication to which he or she is not a party unless he or she does with the consent of all parties"; and (3) "us[ing] or disclos[ing] any information which he or she knows or reasonably should know was obtained from a private conversation or private electronic communication in violation of this Article, unless he or she does so with the consent of all of the parties."

208.     The Tracking Technologies constitute "eavesdropping devices" under 720 ILCS 5/14-1(a).

209.     Defendant violated the Illinois Eavesdropping Statute by:

a.   Using the Tracking Technologies to record the sensitive communications made by and to Plaintiff and Class Members through its Website with third parties, including Google, without their knowledge of consent;

b.   Transmitting the sensitive communications made by and to Plaintiff and Class Members through its Website with third parties, including Google, without their knowledge of consent; and,

c.   Disclosing the sensitive communications made by and to Plaintiff and Class

Members through its Website to third parties, including Google, in exchange for marketing and advertising services.

**COUNT IX**
**UNJUST ENRICHMENT**
***(On Behalf of Plaintiff and the Nationwide Class or, alternatively, the Subclass)***

210.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 129 as if fully set forth herein.

211.    Plaintiff pleads this claim in the alternative to their breach of implied contract claim.

212.    Plaintiff and Class Members conferred a monetary benefit on Defendant. Specifically, they provided their Sensitive Information to Defendant, which it exchanged for marketing and advertising services, as described, *supra*.

213.    Defendant knew that Plaintiff and Class Members conferred a benefit which Defendant accepted. Defendant profited from the Sensitive Information of Plaintiff and Class Members by exchanging it for marketing and advertising services.

214.    In particular, Defendant enriched itself by obtaining the inherent value of Plaintiff's and Class Members' Sensitive Information, and by saving the costs it reasonably should have expended on marketing and/or data security measures to secure Plaintiff's and Class Members' Sensitive Information.

215.    Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the privacy of their Sensitive Information.

216.    Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiff and Class Members, obtained by its

surreptitious collection and transmission of their Sensitive Information.

217.    If Plaintiff and Class Members knew that Defendant had not reasonably secured their Sensitive Information, they would not have agreed to provide their Sensitive Information to Defendant.

218.    Plaintiff and Class Members have no adequate remedy at law for this count. An unjust enrichment theory provides the equitable disgorgement of profits even where an individual has not suffered a corresponding loss in the form of money damages.

219.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will continue to suffer injury.

220.    Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them, or to refund the amounts that Plaintiff and Class Members overpaid for Defendant's services.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and other Class and Subclass Members, pray for judgment against Defendant as follows:

A.    an Order certifying the Nationwide Class and Illinois Subclass, and appointing the Plaintiff and their Counsel to represent the Classes;

B.    equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Genetic Testing Information of Plaintiff and Class Members;

C.    injunctive relief requested by Plaintiffs, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members;

47

D.     an award of all damages available at equity or law, including, but not limited to, actual, consequential, punitive, statutory and nominal damages, as allowed by law in an amount to be determined;

E.     an award of attorney fees, costs, and litigation expenses, as allowed by law;

F.     prejudgment interest on all amounts awarded and

G.     all such other and further relief as this Court may deem just and proper.

<u>**DEMAND FOR JURY TRIAL**</u>

Plaintiff, on behalf of himself and other members of the proposed Classes, hereby demand a jury trial on all issues so triable.

Dated: January 14, 2025          Respectfully submitted,

/s/ *Matthew Langley*
Matthew Langley (6337129)
**ALMEIDA LAW GROUP LLC**
Cook County Firm ID #: 100530
849 W. Webster Ave.
Chicago, Illinois, 60614
Tel.: (954) 579-0027
matt@almeidalawgroup.com

***Attorneys for Plaintiff and the Class***